**FILED**

MAY 1 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Gerald A. Klein, P.C. - State Bar No. 107727
Mark B. Wilson, P.C. - State Bar No. 13'
KLEIN & WILSON
326 Old Newport Boulevard
Newport Beach, CA 92663
(949) 631-3300

Case: 1:07-mc-00194
Assigned To : Unassigned
Assign. Date : 5/10/2007
Description: Reg. of Judgment

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA  07-194(una)

STM Networks, Inc.

v.

Clay Pacific S.R.L., et al.

Plaintiff(s)

Defendant(s)

CASE NUMBER:

SACV03-1796 DOC (MLGx)

**CERTIFICATION OF JUDGMENT FOR REGISTRATION IN ANOTHER DISTRICT**



I, Sherri R. Carter, Clerk of this United States District Court certify that the attached judgment

is a true and correct copy of the original judgment entered in this action on ___April 4, 2005___

*Date*

as it appears in the record of this court, and that * *(see below)*

An appeal has been taken from this judgment, however, appellant has not filed a motion to
stay enforcement of the judgment and/or has not submitted a bond as set forth in Federal
Rules of Appellate Procedure, rule 8.

IN TESTIMONY WHEREOF, I sign my name and affix the seal of this Court on ___MAY - 2 2007___

*Date*

**SHERRI R. CARTER**

CLERK, U.S. DISTRICT COURT

By: _____

Deputy Clerk

* Insert the appropriate language:

"no notice of appeal from this judgment has been filed, and no motion of any kind listed in Rule 4(a) of the Federal
Rules of Appellate Procedure has been filed."

"no notice of appeal from this judgment has been filed, any motions of the kinds listed in Rule 4(a) of the Rules of
Appellate Procedure [*] have been disposed of, the latest order disposing of such a motion having been entered on
[date]."

"an appeal was taken from this judgment and this judgment was affirmed by mandate of the Court of Appeals
issued on [date]."

"An appeal was taken from this judgment and the appeal was dismissed by order entered on [date]."

[NOTE: The motions listed in Rule 4(a), Fed.R.App.P., are motions: for judgment notwithstanding the verdict; to amend or
make additional findings of fact; to alter or amend the judgment; for a new trial; and for an extension of time for filing a notice
of appeal.]





ENTERED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

APR - 4 2005

CENTRAL DISTRICT OF CALIFORNIA
BY              DEPUTY

FILED

APR - 4 2005

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY              DEPUTY

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRP, RULE 77 (d).

Priority
Send
Clsd
Enter
JS-5/JS 6
JS-2/JS 3

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| | |
|---|---|
| STM NETWORKS, INC., a Delaware corporation, | Case No. SACV03-1796 DOC (MLGx) |
| | Honorable David O. Carter |
| Plaintiff, | Courtroom 9D |
| vs. | JUDGMENT |
| CLAY PACIFIC S.R.L.; PACIFIC TELECOM S.A.; JUAN AYOROA; ROSEMARY AYOROA; and DOES 1 through 100, inclusive, | Trial:    February 9, 2005 |
| Defendants. | |
| AND RELATED COUNTERCLAIM | |

This case arises out of a complaint by plaintiff STM Networks, Inc. ("Networks") against defendants Clay Pacific S.R.L. ("Clay"), Pacific Telecom S.A. ("Pacific"), and Juan Ayoroa and Rosemari Ayoroa (collectively the "Ayoroas"), and a counterclaim by Clay and Pacific against Networks, Emil Youssefzadeh ("Emil"), and Albert Youssefzadeh ("Albert").

Prior to trial, the court granted summary judgment on the counterclaim to Albert and Emil. Attached as Exhibit 1 to this judgment is a copy of the court's order awarding summary judgment to Albert and Emil on all counterclaims. In addition, pursuant to the

1    court's order attached as Exhibit 1, the court also granted summary adjudication in favor

2    of Networks regarding the following factual issues:

3             1.    Clay issued a Purchase Order to Networks on August 29, 2003 for 70

4    Solantes in exchange for a price of $485,100, to be paid when the goods arrived at

5    the warehouse of Entel;

6             2.    Clay received the 70 Solantes from Networks and sold them to Entel;

7             3.    Clay did not pay Networks the price of $485,100.00; and

8             4.    Networks was bound by all executory obligations of the Business

9    Partnership Agreement between the parties which arose after the date of the

10    bankruptcy court order dated March 17, 2003.

11    The court also struck all of Clay's affirmative defenses, except for the eleventh affirmative

12    defense of offset. The court further granted summary judgment to Networks on the second

13    and third causes of action of the counterclaim.

14         Prior to trial, Networks abandoned all its causes of action in its complaint, except for

15    the first cause of action against Clay and abandoned all claims against Pacific and the

16    Ayoroas.

17         On February 9, 2005, this case proceeded to trial on the first cause of action of the

18    complaint by Networks against Clay for failure to pay for a purchase order and on the first

19    cause of action of the counterclaim by Clay and Pacific against Networks relating to a claim

20    that Networks breached the Business Partnership Agreement. A jury of eight persons was

21    impaneled and sworn. Witnesses were sworn and testified. Prior to jury deliberations, one

22    juror was excused by stipulation of the parties leaving seven jurors to deliberate. Pursuant

23    to an unopposed motion for judgment as a matter of law filed by Pacific, and the Ayoroas,

24    the court awarded judgment in favor of Pacific and the Ayoroas on the complaint of

25    Networks. After hearing the evidence and argument of counsel, the jury was instructed by

26    the court and the issues not resolved by summary judgment or summary adjudication were

27    submitted to the jury on February 22, 2005.

28    ///

1   The jury deliberated and reached the unanimous verdict recorded on a special verdict

2   form attached as Exhibit 2 to this judgment. The jury was polled with each juror stating the

3   verdict form reflected his or her verdict.

4   Based upon the court's findings and the findings of the jury, the court now renders

5   the following judgment:

6   1.   Judgment is awarded in favor of Networks against Clay on the first

7   cause of action of Networks' complaint in the amount of $450,213.89, plus

8   prejudgment interest in the amount of $67,100.37.

9   2.   Judgment is awarded in favor of the Ayoroas and Pacific on Networks'

10   complaint. Networks therefore takes nothing from the Ayoroas and Pacific on the

11   complaint.

12   3.   Judgment is awarded in favor of Networks, Albert, and Emil on the

13   counterclaim of Clay and Pacific. Clay and Pacific therefore take nothing on their

14   counterclaim.

15

16   Dated: April 4 , 2005

_David O. Carter_
DAVID O. CARTER
United States District Court

17

18

19

20

21

22

23

24

25

26

27

28



__ Prior
__ Send
__ Clsd
__ Enter

JS-5/JS-6
JS-2/JS-3

**FILED**

FEB - 7 2005

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STM NETWORKS, INC., a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> CLAY PACIFIC S.R.L.; PACIFIC TELECOM S.A.; JUAN AYOROA; ROSEMARY AYOROA; and DOES 1 through 100, inclusive, <br><br> Defendants. <br> _____ <br><br> CLAY PACIFIC S.R.L., a Bolivian corporation; PACIFIC TELECOM S.A., a Bolivian entity, <br><br> Counter Claimants, <br><br> v. <br><br> STM NETWORKS, INC., a Delaware corporation; EMIL YOUSSEFZADEH, and individual; ALBERT YOUSSEFZADEH, and individual; BROADEDGE INC., a Delaware corporation, <br><br> Counter Defendants. | CASE NO. SACV 03-1796 DOC (MLGx) <br><br> [TENTATIVE] ORDER VACATING AND SUPERSEDING ORDER DATED JANUARY 11, 2005; GRANTING COUNTER DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S FIRST MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S SECOND MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANTS' APPLICATION FOR LEAVE TO AMEND THE COUNTERCLAIMS; AND GRANTING COUNTER DEFENDANTS' APPLICATION TO QUASH SUBPOENAS DUCES TECUM. |

DOCKETED ON CM

FEB - 7 2005

BY _____ 040

EXHIBIT 1
Page 4

(115)

1    On December 13, 2004, Plaintiff and Counter Defendant STM Networks, Inc.

2    ("Networks") and Counter Defendants Emil Youssefzadeh and Albert Youssefzadeh moved for

3    partial summary judgment. Networks moved for summary judgment on its first cause of action

4    against Defendants Clay Pacific S.R.L., Pacific Telecom S.A., Juan Ayoroa, and Rosemari

5    Ayoroa and on Defendants' counterclaims.[1] Counter Defendants Albert and Emil Youssefzadeh

6    have moved for summary judgment of the counterclaim against them. After reviewing the

7    moving, opposing,[2] and replying papers, and hearing oral argument on January 10, 2005, the

8    Court issued an order on January 11, 2005 granting summary judgment on all counterclaims

9    against Emil Youssefzadeh and Albert Youssefzadeh and all counterclaims against Networks,

10    and granting summary adjudication of limited factual issues relevant to Networks' claim against

11    Defendants. Subsequent to the January 11, 2005 order, the parties submitted ex parte

12    applications for leave to file a second motion for summary judgment, for leave to amend the

13    counterclaims, and to quash subpoenas issued after the discovery deadline. As a result of

14    considering the various ex parte applications, the Court has reconsidered the issues addressed in

15    the January 11, 2005 order. After reviewing the papers submitted by the parties and for the

16

17    [1]The Court is in receipt of the stipulation of Plaintiff, Defendants, and Counter

18    Defendants regarding Plaintiff's abandonment of all but the first cause of action of the complaint and the addition of six affirmative defenses to the answer to the counterclaim.

19    The Court has granted the stipulation and proposed order. Thus, this motion for summary

20    judgment relates to the only cause of action in the complaint and all counterclaims.

21    [2] Defendants filed a "Notice of Cross Motion for Summary Judgment" on the

22    grounds that Networks' complaint is barred under the doctrine of res judicata and barred as a result of set-offs owed to Defendants exceeding the amount of Networks' demands in

23    the complaint. The Memorandum of Points and Authorities in support of the motion for summary judgment states that Defendants intend to rely upon the points made in the

24    papers submitted in opposition to Plaintiff's motion for summary judgment. Defendants

25    also remind the Court that the Court has the power to enter summary judgment sua sponte. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S. Ct. 2548, 2554 (1986).

26    Because Defendants' motion for summary judgment does not go beyond Defendants'

27    opposition to Plaintiffs' motion, and because Defendants' notice of motion fails to indicate compliance with Local Rule 7-3, the Court considers Defendants' submissions to

28    be in opposition to Plaintiffs' motion.

EXHIBIT 1
Page 5

1    reasons set forth below, the Court (1) GRANTS the motion by Counter Defendants Albert

2    Youssefzadeh and Emil Youssefzadeh for summary judgment of all counterclaims against them;

3    (2) GRANTS Networks' motion for an order of summary adjudication with respect to specific

4    factual issues; (3) STRIKES all affirmative defenses except for the eleventh, off set; (4)

5    GRANTS Networks' motion for summary judgment on the first portion of the first counterclaim

6    pertaining to breach of the Oral Commission Agreement; (5) GRANTS Networks' motion for

7    summary judgment on the second and third counterclaims; (6) DENIES Networks' motion for

8    summary judgment on the affirmative defense of offset; (7) DENIES Defendants' application for

9    leave to amend the counterclaims; and (8) GRANTS Counter Defendants' application to quash

10   subpoenas duces tecum issued after the discovery deadline.  This order vacates and completely

11   supersedes the January 11, 2005 order.

12   **I.    BACKGROUND**

13       Counter Defendant Emil Youssefzadeh founded STM Wireless ("Wireless") in 1982.

14   Wireless is not a party to this action.  Wireless was involved in the business of the very small

15   aperture terminal ("VSAT").  VSAT technology allows the transmission of voice and data

16   through satellites.  VSAT technology is an inexpensive alternative to building expensive land

17   lines for telecommunications systems and it is particularly cost-efficient in third world countries

18   that cannot afford to build the infrastructure necessary to support land lines.  Because Wireless

19   was a small company that did business globally, it would generally subcontract with local

20   companies in different areas of the world to assist Wireless in making sales and servicing

21   products after a contract had been won.

22       In 1999, Wireless won a contract to provide VSATs to Entel, which is Bolivia's largest

23   telephone company.  This contract was pursuant to a directive of the Bolivian government,

24   which required Entel to provide telephone services to various remote and mountainous regions

25   of Bolivia.  Wireless was to install and service 550 rural satellite telephone systems, which

26   included a hub, terminals (VSATs), and antennas.

27   **A.    Facts Underlying Defendants' First Counterclaim**

28       Wireless entered into a written agreement with Clay ("Back-to-Back Agreement"), under

1   which Clay would act as Wireless' local agent. Defendants claim that after the completion of the

2   Back-to-Back Agreement in or about August 2000 and continuing through June 2001, Clay and

3   Wireless orally agreed that Wireless would pay Clay a six-percent (6%) commission on

4   additional sales of VSATs to Entel plus an installation charge of $3,000 per VSAT installed by

5   Clay. Clay's first counterclaim against Networks is based in part on the allegation that this

6   commission agreement existed and that Wireless never paid the commissions, which amount to

7   $259,078.00. *See* First Amended Answer ("FAA"), ¶¶ 127, 142. Clay alleges these breaches by

8   Wireless against Networks on the theory that Networks is Wireless' successor.

9      In March 2002, Entel sought additional bids for the proposed sale of additional VSATs.

10   Clay and Wireless competed for this bid. Wireless submitted a bid with a different local agent

11   and Clay submitted a bid with a different supplier of equipment, Gilat. In anticipation of

12   winning the bid, Wireless shipped 400 VSATs to Bolivia, which were kept in a customs-free

13   zone in a warehouse at substantial cost. But contrary to Wireless' anticipation, Entel awarded

14   the contract to Clay. Clay alleges that as a result of severe disappointment, Emil Youssefzadeh

15   immediately approached Juan Ayoroa of Clay and "began stalking, begging and cajoling him to

16   sign the Business Partnership Agreement." Opp., p.6. The Business Partnership Agreement was

17   intended to substitute Wireless' equipment for the Gilat equipment in the second Entel contract.

18   According to Clay, Clay finally capitulated and signed the Business Partnership Agreement with

19   Wireless only after relentless pursuit and threats by Wireless that Wireless would refuse to

20   provide support for the 1300 Wireless VSATs sold to Entel on the first contract and Back-to-

21   Back Agreement. Wireless and Clay signed the Business Partnership Agreement on July 12,

22   2002. FAA, ¶ 131, Ex. C. Clay's first counterclaim is based in part on various alleged breaches

23   of the Business Partnership Agreement. Networks, on the other hand, claims that the entire

24   Business Partnership Agreement was conditioned on Entel purchasing 400-500 VSATs from

25   Clay and further claims that Entel only purchased 150 VSATs from Clay.

26      **B.**     **Facts Underlying Defendants' Second and Third Counterclaim**

27      On July 31, 2000, Wireless and Clay entered into the "SpaceWeb Agreement." Under

28   this agreement, Clay purchased 150 SpaceWeb terminals from Wireless. Clay intended to resell

**EXHIBIT 1**
**Page 7**

1  these terminals to Entel and to local internet cafes in Bolivia. Wireless was to provide high-

2  speed internet access to Clay for a monthly service charge. Clay claims that Wireless breached

3  this agreement and perpetrated a fraud on Clay because both the terminals and the speed of the

4  wireless service "proved to be less than represented." Opp., p.6. Clay wanted to return 100 of

5  the SpaceWeb terminals to Wireless as defective. This alleged breach occurred some time prior

6  to July 12, 2002, when the parties executed the Business Partnership Agreement. *See* Opp., p.9.

7  Paragraph two of the Business Partnership Agreement apparently relates to the SpaceWeb

8  Agreement and, as alleged by Clay, the Business Partnership Agreement replaced the SpaceWeb

9  Agreement.

10      **C.    Wireless' Bankruptcy Proceeding and Sale**

11          On February 20, 2003, Wireless commenced a Chapter 11 bankruptcy proceeding. On

12  March 17, 2003, the Bankruptcy Court for the Central District of California issued an order "(1)

13  Approving the Sale of Substantially All of the Assets of the Estate Free and Clear of Liens,

14  Clams [sic] and Interests Pursuant to 11 U.S.C. § 363, and (2) Authorizing Debtor to Assume

15  and Assign Executory Contracts." Suppl. Emil Youssefzadeh Decl., Ex. 11.[3] The order

16  authorized the sale of Wireless' assets to Sloan Capital Partners LLC ("Sloan"). The order

17  specifically stated that the sale of the assets was "free and clear of all liens . . . including

18  successor liabilities." *Id.*, Ex. 11, p.20. The order also authorized Wireless to assume and assign

19  to Sloan certain "Designated Contracts, as defined and identified in the Asset Purchase

20  Agreement, pursuant to 11 U.S.C. § 365." *Id.* Attached to the order is a list of "Assigned

21  Contracts," which names the following two contracts with Clay as assigned: (1) "Purchase

22  ———————————————

23      [3]Networks has requested that the Court take judicial notice of the "Amended Order
    (1) Approving the Sale of Substantially All of the Assets of the Estate Free and Clear of
24  Liens, Clams [sic] and Interests Pursuant to 11 U.S.C. § 363, and (2) Authorizing Debtor
    to Assume and Assign Executory Contracts" entered March 17, 2003. A Court may take
25  judicial notice of facts "not subject to reasonable dispute" because they are either "(1)
26  generally known within the territorial jurisdiction of the trial court or (2) capable of
    accurate and ready determination by resort to sources whose accuracy cannot reasonably
27  be questioned." Fed. R. Evid. 201. Thus, the Court takes judicial notice of this court
28  document.

EXHIBIT 1
Page 8

1 Agreement" dated July 31, 2000, and (2) "Amendment to Product Supply Agreement (dated

2 March 25, 2002) between STM Wireless & Sisteco" dated June 20, 2002. *Id.*, Ex. 11. The order

3 specifically states that "[a]ll defaults or other obligations of [Wireless] under the Designated

4 Contracts arising or accruing prior to the date of this Order . . . shall be deemed cured upon

5 payment by [Wireless] at the Closing, or as soon thereafter as practicable of the cure amounts."

6 *Id.*, Ex. 11, p.33. The order also states that "[e]ach non-Debtor party to a Designated Contract is

7 hereby forever barred, estopped and permanently enjoined from asserting against Sloan or its

8 successors or assigns any default existing as of the Closing or any claim asserted or assertable

9 against the Debtor." *Id.* Additionally, the Agreement of Purchase and Sale, which was approved

10 by the bankruptcy order, states that "[Sloan] hereby agrees to assume only: (i) those liabilities

11 and obligations specifically set forth in Schedule I(b) and (ii) those executory obligations arising

12 *after* the Closing Date under the Assigned Contracts." *Id.*, Ex. 11, p.42 (emphasis added).

13      The bankruptcy court also explicitly acknowledged that Farhad Youssefzadeh, the

14 President of Sloan, is the brother-in-law and a second cousin of Emil Youssefzadeh, the Chief

15 Executive Officer of Wireless, the debtor in possession and that Faramarz Youssefzadeh, the

16 Vice President of Sloan, is the second cousin of Emil Youssefzadeh. *Id.*, Ex. 11, p.26. Sloan

17 later transferred the purchased assets and assigned contracts to STM Networks, of which Emil

18 Youssefzadeh is an officer.

19     D.    **Facts Underlying Networks' Breach of Contract Claim**

20      On August 29, 2003, Clay sent a purchase order to Networks for 70 "SES Solante ODU

21 set complete w/Antenna/ Bat / solar Pannel [sic] / cables" for a total price of $485,100.00.

22 Suppl. Emil Youssefzadeh Decl., Ex. 1. The purchase order also states: "Payment 100 % value

23 when the goods arrive to warehouse of ENTEL (1 week)." *Id.* This purchase order forms the

24 basis of Networks' claim against Defendants. Networks claims that it shipped the 70 Solante

25 units, but Defendants never paid the $485,100.00. Defendants, on the other hand, claim that

26 "[b]ased upon an oral agreement and the parties past dealings, Networks agreed to ship 70 SES

27 solante terminals for Entel and another 70 terminals to Clay as part of its obligation under the

28 [Business Partnership Agreement]. Networks never shipped the 70 terminals to Clay. Clay was

1  not obligated to pay the purchase order amount until it received the entire shipment." Statement

2  of Genuine Issues, ¶ 45.  Clay acknowledges that it received the 70 Solante units that were

3  intended for Entel from Networks and sold them to Entel.  Juan Ayoroa Dep., 123:24-124:3.

4  **II.    LEGAL STANDARD**

5          Summary judgment is proper if "the pleadings, depositions, answers to interrogatories,

6  and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

7  to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.

8  R. Civ. P. 56(c).

9          The Court must view the facts and draw inferences in the manner most favorable to the

10  non-moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962).

11  However, the existence of some alleged factual dispute between the parties will not defeat an

12  otherwise properly supported motion for summary judgment; to defeat the motion, the non-

13  moving party must affirmatively set forth facts showing there is a genuine issue for trial.

14  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986).  The

15  moving party bears the initial burden of demonstrating the absence of a genuine issue of material

16  fact for trial.  *Id.* at 256, 106 S. Ct. at 2514.  When the non-moving party bears the burden of

17  proving the claim or defense, the moving party can meet its burden by pointing out the absence

18  of evidence of a genuine issue of material fact from the non-moving party.  *Musick v. Burke*, 913

19  F.2d 1390, 1394 (9th Cir. 1990).  The moving party need not disprove the other party's case.

20  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25, 106 S. Ct. 2548, 2553-54 (1986).

21          When the moving party meets its burden, the "adverse party may not rest upon the mere

22  allegations or denials of the adverse party's pleading, but the adverse party's response, by

23  affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is

24  a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if

25  appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e).  "The mere

26  existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the

27  jury could reasonably find for [the opposing party]." *Anderson*, 477 U.S. at 252, 106 S. Ct. at

28  2512.

1    A district court has the power and the duty to correct judgments that it believes to be in

2    error, and may do so *sua sponte* under Federal Rule of Civil Procedure 60(b) with notice and

3    opportunity to be heard. *See Kingvision Pay-Per-View, Ltd. v. Lake Alice Bar*, 168 F.3d 347,

4    350-51 (9th Cir. 1999); *cf. Fort Knox Music, Inc. v. Baptiste*, 257 F.3d 108, 110 (2d Cir. 2001).

5    **III.    ANALYSIS**

6        **A.    COUNTER DEFENDANTS' MOTION IS UNOPPOSED**

7        As a preliminary matter, the Court notes that the motion by Counter Defendants Albert

8    and Emil Youssefzadeh is unopposed by Defendants. Under Local Rule 7-12, "failure to file any

9    required paper . . . may be deemed consent to the granting or denial of the motion." L.R. 7-12.

10   Thus, the Court GRANTS summary judgment in favor of Counter Defendants Albert

11   Youssefzadeh and Emil Youssefzadeh with respect to all counterclaims against them.

12       **B.    FIRST MOTION FOR SUMMARY JUDGMENT BY NETWORKS**

13       Plaintiff Networks has moved for summary judgment or partial summary judgment as to

14   Networks' cause of action for breach of contract, the first portion of Defendants' first

15   counterclaim, and Defendants' second and third counterclaims.

16           **1.    Networks' Breach of Contract Claim**

17       Although Networks attempts to move for summary judgment as to its breach of contract

18   claim, the motion is procedurally improper because Networks has not attempted to obtain a full

19   appealable adjudication of the entire claim. Rather, Networks has asked the Court to find that no

20   genuine dispute of material fact exists as to either Networks' prima facie case or a number of

21   Defendants' affirmative defenses (the first through the tenth, the twelfth through the fifteenth,

22   and the eighteenth through the twenty-fourth). Networks has not moved for summary judgment

23   with respect to Defendants' eleventh, sixteenth, or seventeenth affirmative defenses. Because

24   liability cannot be determined without assessing the merits of the prima facie case as well as any

25   affirmative defenses, summary judgment under Rule 56(c) is improper.

26       Under Rule 56(d), if a party moves for summary judgment and the court finds that the

27   court cannot fully adjudicate the case on the motion, then the court "shall if practicable"

28   determine "what material facts exist without substantial controversy and what material facts are

1 | actually and in good faith controverted" and shall "thereupon make an *order* specifying the facts

2 | that appear without substantial controversy." Fed. R. Civ. P. 56(d) (emphasis added). "Upon the

3 | trial of the action the facts so specified shall be deemed established, and the trial shall be

4 | conducted accordingly." *Id.* A critical distinction between obtaining summary judgment under

5 | 56(c) and an order issued under 56(d) is that an order under 56(d) cannot determine liability and

6 | is only intended to save time and expense and to simplify the factual issues at trial. 10B Wright,

7 | Miller & Kane, Federal Practice and Procedure: Civil 3d § 2737 (distinguishing the last sentence

8 | of Rule 56(c), which permits summary judgment as to liability only, with Rule 56(d), which

9 | "does not authorize the entry of a judgment on part of a claim"). The purpose of an order under

10 | Rule 56(d) is to remove sham issues and to salvage the results of unsuccessful summary

11 | judgment proceedings. *Id.* Because Networks has improperly moved for summary judgment of

12 | only part of a claim, the Court will consider Networks' motion as a motion for summary

13 | adjudication of certain issues under Rule 56(d).[4]

14 | **a.    Facts Underlying Prima Facie Claim of Breach**

15 | .    The facts underlying the elements of Networks' prima facie breach of contract claim are

16 | not in dispute. "A cause of action for damages for breach of contract is comprised of the

17 | following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance,

18 | (3) defendant's breach, and (4) the resulting damages to plaintiff." *Armstrong Petroleum Corp.*

19 | *v. Tri-Valley Oil & Gas Co.,* 116 Cal. App. 4th 1375, 1391 n.6 (Cal. Ct. App. 2004). Networks

20 | has demonstrated that Clay issued a Purchase Order to Networks for 70 Solantes in exchange for

21 | a price of $485,100, to be paid when the goods arrive at the warehouse of Entel. Juan Ayoroa

22 | Dep., 122:11-123:23. Clay acknowledges that it received the 70 Solantes from Networks and

23 |

24 |     [4]It should be noted that under the language of Rule 56(d), the Court need only

25 | enter an order ascertaining undisputed material facts if a proper motion for summary
judgment is brought and cannot be rendered. But the Court does not consider Networks'

26 | failure to move for full summary judgment of its breach of contract claim to be fatal to its
attempt to remove sham issues from trial. In this case, the Court will entertain Networks'

27 | motion because removing certain affirmative defenses from trial will expedite

28 | adjudication on the merits.

1  sold them to Entel. Juan Ayoroa Dep., 123:24-124:3. Clay also acknowledges that it did not pay

2  Networks for the shipment of 70 Solantes. Juan Ayoroa Dep., 124:11-13. These facts tend to

3  establish Networks' prima facie claim of breach of contract. Further, Defendants do not dispute

4  that Networks has established a prima facie claim for breach of contract. Rather, Defendants

5  focus on the two affirmative defenses of set-off and res judicata. Thus, the facts stated above

6  pertaining to the prima facie claim of breach appear to exist without substantial controversy.

7                    b.        **Defendants Have Not Opposed Summary Adjudication of Most**

8                              **Affirmative Defenses**

9        Defendants have not specifically opposed Networks' motion for summary adjudication of

10  the second, fifth, sixth, seventh, ninth, tenth, thirteenth, fourteenth, fifteenth, nineteenth, twenty-

11  first, twenty-second, twenty-third, and twenty-fourth affirmative defenses. Accordingly,

12  summary adjudication of these affirmative defenses is proper. The effect of granting summary

13  adjudication of these issues is to strike the affirmative defenses, rather than to set forth specific

14  facts to be deemed established at trial. The affirmative defenses listed above are STRICKEN.

15                    c.        **First Affirmative Defense: Failure to State a Claim**

16        Under Federal Rule of Civil Procedure 12(b)(6), failure to state a claim may be raised as a

17  defensive motion, but it is not an affirmative defense. Fed. R. Civ. P. 12(b)(6). The first

18  affirmative defense for failure to state a claim is STRICKEN.

19                    d.        **Third Affirmative Defense: Performance**

20        Networks is correct that performance is not an affirmative defense. As part of the prima

21  facie claim of breach of contract, Networks must prove that Defendants failed to perform. *See*

22  *Armstrong Petroleum Corp.*, 116 Cal. App. 4th at 1391 n.6. Defendants attempt to substantiate

23  this affirmative defense by reciting facts regarding the transaction involving Space Web

24  terminals. The purchase order for the Solantes does not reference the Space Web terminal

25  transaction and, instead, clearly states that full payment will occur upon delivery of the goods to

26  the warehouse of Entel. Juan Ayoroa Decl., Ex. 1. Thus, the Space Web terminal transaction

27  appears to be separate from the transaction involving 70 Solantes. The facts recited by

28  Defendants may be relevant to a separate affirmative defense of set off, but they do not sustain

**EXHIBIT 1**
Page 13

1 | the so-called affirmative defense of performance. The third affirmative defense is STRICKEN.

2 |           e.    **Fourth Affirmative Defense: Accord and Satisfaction**

3 |     The elements of the affirmative defense of accord and satisfaction are: (1) that there was

4 | a bona fide dispute between the parties, (2) that the debtor made it clear that the creditor's

5 | acceptance of what the debtor tendered would constitute full satisfaction of the creditor's claim,

6 | and (3) that the creditor understood when accepting the tender that the debtor intended such

7 | remittance to constitute payment in full of the particular claim. *BII Fin. Co. v. U-States*

8 | *Forwarding Services Corp.*, 95 Cal. App. 4th 111, 126-127 (Cal. Ct. App. 2002). Such a

9 | situation always involves two contracts: the original contract and the accord. Performance of the

10 | accord is termed "satisfaction." When a defendant asserts the defense of accord and satisfaction,

11 | he is acknowledging that the parties had a bona fide dispute about the contract upon which the

12 | plaintiff is now suing. He is further asserting that the parties reached a second agreement, an

13 | accord, and that the substance of the accord was that the plaintiff would give up the dispute

14 | about the original contract in exchange for some performance by the defendant. If the defendant

15 | performs the accord, creating satisfaction, and the plaintiff sues on the original contract anyway,

16 | the defendant can assert the affirmative defense of accord and satisfaction.

17 |     Here, Defendants seem to be contending that the Solantes transaction, which is the object

18 | of Networks' claim, was an accord and that Networks' delivery of the 70 Solantes was a

19 | satisfaction. As a result, Defendants assert that they were not obligated to pay for the 70

20 | Solantes that Networks delivered. That factual assertion does not support the defense of accord

21 | and satisfaction. It may support an affirmative defense of set-off, but it is not the proper manner

22 | of asserting the affirmative defense of accord and satisfaction. Thus, the fourth affirmative

23 | defense is STRICKEN.

24 |           f.    **Eighth Affirmative Defense: Unclean Hands**

25 |     "Unclean hands . . . requires inequitable conduct by the plaintiff in connection with the

26 | matter in controversy and provides a complete defense to the plaintiff's action." *Dickson,*

27 | *Carlson & Campillo v. Pole*, 83 Cal. App. 4th 436, 446 (Cal. Ct. App. 2000). The inequitable

28 | conduct that Defendants claim occurred consists of the allegation that Emil Youssefzadeh was

**EXHIBIT 1**
**Page 14**

1  extremely persistent in attempting to convince Clay to enter into the Business Partnership

2  Agreement. Juan Ayoroa Decl., ¶¶ 13-21. This conduct is alleged to have occurred at some time

3  prior to July 12, 2002, when the parties entered into the Business Partnership Agreement. Juan

4  Ayoroa Decl., ¶ 21. By contrast, the purchase order for the 70 Solantes, which forms the basis of

5  Networks' claim against Defendants, is dated August 29, 2003. Emil Youssefzadeh Decl., Ex. 1.

6  This lapse in time of approximately one year demonstrates to the Court that any bad conduct that

7  occurred is not sufficiently connected to the matter in controversy to provide a complete defense

8  to Networks' action. The eighth affirmative defense is STRICKEN.

9                 **g.**     **Twelfth Affirmative Defense: Failure of Consideration**

10       To establish the defense of failure of consideration, Defendants must show that although

11  a valid contract with consideration existed when the agreement was made, "because of some

12  supervening cause, the promised performance fails." 3 Williston on Contracts § 7:11 (4th ed.).

13  Defendants assert that there was a failure of consideration that discharged Clay's obligation to

14  pay Networks for the $485,100.00 for 70 Solantes because Defendants did not receive "the

15  equipment promised by Networks under the Business Partnership Agreement." Opp., p.21.

16  Presumably, this assertion in the opposition is based on Juan Ayoroa's statement in his

17  declaration that the purchase order for 70 Solantes was incorporated into the Business

18  Partnership Agreement through oral agreement and past dealings. *See* Juan Ayoroa Decl., ¶ 40.

19  Regarding the purchase order that forms the basis of Networks' claim against Defendants, Juan

20  Ayoroa states in his declaration:

21         Entel then placed a second order in mid 2003 for 70 additional

22         VSATs. In response, Clay submitted to STM Networks a purchase

23         order for $485,100. Based upon an oral agreement and the parties

24         [sic] past dealings, Networks agreed to ship 70 SES solante terminals

25         for Entel and another 70 terminals to Clay as part of its obligation

26         under the BPA. Networks never shipped the 70 terminals to Clay.

27         Clay was not obligated to pay the purchase order amount until it

28         received the entire shipment.

12

**EXHIBIT 1**
**Page 15**

1 | Juan Ayoroa Decl., ¶ 40. It is undisputed that Networks shipped the 70 units for Entel. Juan

2 | Ayoroa Dep., 123:24-25. Additionally, the purchase order clearly lists 70 units with a total price

3 | of $485,100 and states: "Payment 100% value when the goods arrive to warehouse of ENTEL (1

4 | week)." Emil Youssefzadeh Decl., Ex. 1.

5 |         Under California law, "[t]erms set forth in a writing intended by the parties as a final

6 | expression of their agreement with respect to such terms as are included therein may not be

7 | contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." Cal.

8 | Civ. Proc. Code § 1856. The terms set forth in the purchase order are clear that Clay would pay

9 | $485,100 in consideration of Networks' shipment of 70 SES Solante units. Mr. Ayoroa's

10 | declaration is the only evidence before the Court of the alleged oral agreement for an additional

11 | 70 units to be shipped for Clay. Similarly, this paragraph of Mr. Ayoroa's declaration is the only

12 | evidence that the purchase order was incorporated into the Business Partnership Agreement.

13 | Defendants cannot contradict the terms of the purchase order with evidence of a

14 | contemporaneous or prior oral agreement. Thus, Defendants' twelfth affirmative defense is

15 | STRICKEN.

16 |                  **h.    Eighteenth Affirmative Defense: Novation**

17 |         Defendants' only argument in support of the defense of novation is as follows: "The

18 | Business Partnership Agreement replaced the prior repair lab agreement and was assumed by

19 | Networks. This replacement of one agreement for another amounts to novation." Opp., p.21.

20 | But the prior repair lab agreement is not at issue in Networks' claim against Defendants. Thus,

21 | the eighteenth affirmative defense is STRICKEN.

22 |                  **I.    Twentieth Affirmative Defense: Failure of Condition**

23 |         In support of the defense of failure of condition, Defendants simply state that "Clay

24 | Pacific's obligation to pay Networks on this purchase order was conditioned upon Networks

25 | delivering all the equipment promised." Opp., p.21. But beyond this conclusory statement,

26 | Defendants have failed to produce any evidence indicating that Defendants' duty to perform was

27 | conditional. Thus, the twentieth affirmative defense is STRICKEN.

28 | ///

1      **2.**    **Networks Is Entitled to Partial Summary Judgment on the**

2           **Counterclaims**

3           **a.**    **First Counterclaim**

4      Defendants' first counterclaim is for breach of contract, but it actually consists of two

5  separate claims for at least two separate breaches of two separate contracts: (1) the oral

6  commission agreement and (2) the Business Partnership Agreement. Networks has moved for

7  summary judgment with respect to the alleged breach of the oral commission agreement, but not

8  with respect to the alleged breach of the Business Partnership Agreement.

9      Summary judgment is proper with respect to the first portion of the first counterclaim,

10  relating to breach of the oral commission agreement. Defendants claim that "[i]n or about

11  August, 2000 [sic] and continuing through about June 2001, STM and Clay orally agreed that

12  STM would pay Clay a six percent (6%) commission on additional sales of VSATs plus an

13  installation charge of $3,000 per VSAT installed by Clay ('Oral Agreement')." FAA, ¶ 127.

14  The language of this allegation, particularly Defendants' choice to refer to "STM" instead of

15  either "STM Wireless" or "STM Networks," indicates the problem with this claim. In his

16  deposition, Mr. Ayoroa indicated that the alleged oral agreement was with STM Wireless, not

17  STM Networks. Juan Ayoroa Dep., 219:21-220:8. He also indicated that the alleged breach

18  occurred between 1999 and 2000 and that he discovered the breach in 2001. Juan Ayoroa Dep.,

19  220:13-24.

20      Under the plain language of the order of the bankruptcy court, Defendants cannot assert

21  this claim against Networks. First, it does not appear that Wireless assumed or assigned this

22  agreement, as it does not appear on the list of Assigned Contracts attached to the bankruptcy

23  court's order. Further, even if Wireless were to have assumed and assigned its executory

24  obligations under the agreement, it is clear that the alleged breach occurred prior to the date of

25  the bankruptcy court's order and is therefore barred. The bankruptcy order states that all

26  defaults or obligations of Wireless arising or accruing prior to the date of the bankruptcy order

27  are deemed cured and that no party to any assumed contract can assert such claim against Sloan

28  or its successors or assigns. Suppl. Emil Youssefzadeh Decl., Ex. 11, p.33; *see also* 11 U.S.C. §

1   365(b)(1) (requiring that if there has been a default in an executory contract of the debtor the

2   contract may not be assumed unless the party assuming the contract (A) cures, or provides

3   adequate assurance that it will promptly cure, such default, (B) compensates, or provides

4   adequate assurance that it will promptly compensate, loss resulting from such default, and (C)

5   provides adequate assurance of future performance under such contract or lease).  Therefore,

6   Defendants cannot now assert against Networks the claim that Wireless breached this oral

7   agreement prior to the order of the bankruptcy order.

8       Defendants argue that Networks should be liable for the alleged breaches by Wireless

9   because Networks is "merely a continuation" of Wireless.  *See* Opp., p.20.  The general rule of

10  successor liability is that

11          [W]here one corporation sells or transfers all of its assets to another

12          corporation, the latter is not liable for the debts and liabilities of the

13          former unless (1) the purchaser expressly or impliedly agrees to such

14          assumption, (2) the transaction amounts to a consolidation or merger

15          of the two corporations, (3) the purchasing corporation is merely a

16          continuation of the selling corporation, or (4) the transaction is

17          entered into fraudulently to escape liability for debts.

18  *Franklin v. USX Corp.*, 87 Cal. App. 4th 615, 621 (Cal. Ct. App. 2001) (citation omitted).  The

19  "crucial factor" in determining whether a corporate acquisition constitutes a mere continuation is

20  "whether adequate cash consideration was paid for the predecessor corporation's assets."  *Id.* at

21  625.  The transfer of Wireless' assets to Sloan was pursuant to the Asset Purchase Agreement,

22  which was approved by the bankruptcy court.  In the bankruptcy order, the court explicitly found

23  that proper notice had been given to all creditors and that all creditors had a reasonable

24  opportunity to object or be heard.  Suppl. Emil Youssefzadeh Decl., Ex. 11, p.22-23.  Wireless

25  sold the assets to Sloan for a total purchase price of $3,685,622, which consisted of cash

26  consideration of $1,600,000 and the assumption of various liabilities not related to this lawsuit.

27  *Id.* at Ex. 11, p.24.  The bankruptcy court found that the terms and conditions of the Asset

28  Purchase Agreement, including the purchase price, were fair, reasonable and adequate.  *Id.* at Ex.

1    11, p.26.  Additionally, the bankruptcy court explicitly acknowledged that Farhad Youssefzadeh,

2    the President of Sloan, is the brother-in-law and a second cousin of Emil Youssefzadeh, the

3    Chief Executive Officer of Wireless, the debtor in possession, and that Faramarz Youssefzadeh,

4    the Vice President of Sloan, is the second cousin of Emil Youssefzadeh.  *Id.*, Ex. 11, p.26.  The

5    court noted that "[d]espite these relationships, the Asset Purchase Agreement, and the proposed

6    transactions contemplated thereby, was negotiated, proposed, and entered into by the parties

7    without collusion, in good faith, and from arm's-length bargaining positions."  *Id.*

8        Notwithstanding these explicit findings of the bankruptcy court, Defendants argue that

9    STM Networks was a mere continuation of STM Wireless because Networks operated in the

10    same location and with the same people as STM Wireless.  Additionally, Defendants argue that

11    the Wireless' bankruptcy was entered into fraudulently.  However, other than baldly asserting

12    that the bankruptcy occurred under "suspicious circumstances," Defendants offer no evidence

13    that the sale of assets occurred fraudulently or for inadequate consideration.  Additionally,

14    Defendants had actual notice that Wireless was filing for bankruptcy and did not file a claim in

15    the bankruptcy proceeding.  Juan Ayoroa Dep., 63:5-72:17.  Thus, because Defendants offer no

16    evidence demonstrating that the asset transfer was fraudulent or for inadequate consideration, no

17    genuine dispute of material fact exists as to whether Networks can be liable for Wireless'

18    liabilities as a successor of Wireless.  Summary judgment is proper with respect to this first

19    portion of the first counterclaim.

20        Because Networks has not moved for summary judgment on the second portion of the

21    first counterclaim, which asserts breaches of the Business Partnership Agreement, summary

22    judgment is not proper with respect to that portion.  However, it is clear from the evidence

23    submitted by the parties that no reasonable jury could conclude that Wireless did not assume and

24    assign to Sloan the executory obligations of the Business Partnership Agreement.  Although the

25    list of Assigned Contracts attached to the bankruptcy court order does not explicitly refer to the

26    Business Partnership Agreement, Defendants argue that the listed "Amendment to Product

27    Supply Agreement (dated March 25, 2002) between STM Wireless & Sisteco" dated June 20,

28    2002 refers to the Business Partnership Agreement.  Defendants make this argument in spite of.

16    EXHIBIT 1

1   the fact that the Business Partnership Agreement was executed on July 12, 2002 and the list of

2   Assigned Contracts refers to a contract executed on June 20, 2002. The Court is aware that this

3   discrepancy in dates of execution may create some slight doubt as to whether the Business

4   Partnership Agreement was assumed and assigned. However, this slight doubt is greatly

5   outweighed by the admission of Emil Youssefzadeh that Networks did assume the executory

6   obligations of the Business Partnership Agreement. *See* Emil Youssefzadeh Dep., 187:14-19.

7   Based on this admission, the fact that Networks was bound by all executory obligations of the

8   Business Partnership Agreement arising after the date of the bankruptcy court order, March 17,

9   2003, appears to exist without substantial controversy. Summary adjudication of this material

10   fact is proper. *See* Fed. R. Civ. P. 56(d). The remaining issue of whether Networks breached

11   the Business Partnership Agreement at some point after March 17, 2003 is a genuine dispute of

12   fact to be determined at trial.

13                 **b.    Second Counterclaim**

14         Defendants' second counterclaim is also for breach of contract, but this claim relates to

15   the SpaceWeb Agreement. FAA, ¶¶ 147-156. STM Wireless and Clay entered into the

16   SpaceWeb Agreement on July 31, 2000. Both the agreement and the alleged breach, which was

17   based on Counter Defendants failing to provide broadband service at the speed promised,

18   occurred prior to the bankruptcy sale of STM Wireless. *See* Opp., p.9. The list of Assigned

19   Contracts, which is attached to the bankruptcy court order, includes a "Purchase Agreement"

20   with "Clay Pacific," signed on July 31, 2000. *See* Suppl. Emil Youssefzadeh Decl., Ex. 11, p.

21   58. The list may be referring to the SpaceWeb Agreement, but even if the SpaceWeb Agreement

22   was assumed and assigned, Defendants cannot now hold Networks liable for a breach of contract

23   that occurred before the contract was assumed and assigned. *See* Suppl. Emil Youssefzadeh

24   Decl., Ex. 11, p.33; 11 U.S.C. § 365(b)(1). Additionally, as discussed above, Networks is not

25   liable for the alleged breaches by Wireless as a mere continuation.

26         Defendants attempt to save the second counterclaim by asserting that the SpaceWeb

27   Agreement was replaced and restated by the Business Partnership Agreement, which forms the

28   basis of the second portion of Defendants' first counterclaim. But Defendants' second

1 counterclaim clearly refers to the breach of the original SpaceWeb Agreement, which occurred

2 before the parties entered into the Business Partnership Agreement. As discussed above,

3 Networks has not moved for summary judgment with respect to any breach of the Business

4 Partnership Agreement. Thus, although summary judgment is proper with respect to the second

5 counterclaim for breach of the SpaceWeb Agreement, the substance of Defendants' claim may

6 survive as part of the first counterclaim insofar as Defendants are actually asserting a breach of

7 the Business Partnership Agreement.

### c.    Third Counterclaim

8

9 Defendants' third counterclaim is for fraud. Ans., ¶ 158-166. The fraud was allegedly

10 perpetrated by Emil Youssefzadeh, Albert Youssefzadeh, and STM Wireless, but not STM

11 Networks. Juan Ayoroa Decl., ¶ 24. The alleged fraud occurred on February 22, 2001, prior to

12 the bankruptcy sale of Wireless' assets. FAA, ¶ 158. Given that Wireless perpetrated the

13 alleged fraud rather than Networks, Defendants' only argument that Networks should be liable is

14 that Networks is "merely a continuation" of Wireless. *See* Opp., p.20. As discussed above,

15 Defendants have failed to demonstrate that Networks is a mere continuation of Wireless. Thus,

16 summary judgment with respect to the third counterclaim is proper.

### C.    SECOND MOTION FOR SUMMARY JUDGMENT BY NETWORKS

17

18 Subsequent to the Court's order dated January 11, 2005, Networks moved for summary

19 judgment with respect to the affirmative defenses that remained: (1) laches (seventeenth

20 affirmative defense), (2) res judicata (sixteenth affirmative defense), and (3) offset (eleventh

21 affirmative defense). Defendants abandoned the affirmative defense of laches, but opposed the

22 motion with respect to the affirmative defenses of res judicata and offset.

### 1.    Res Judicata

23

24 Defendants argue that res judicata precludes Networks from bringing the instant claim for

25 breach of contract because Networks already sued on the same claim in a Bolivian court. Claim

26 preclusion "treats a judgment, once rendered, as the full measure of relief to be accorded

27 between the same parties on the same 'claim' or 'cause of action.'" *South Delta Water Agency v.*

28 *U.S. Dep't of Interior, Bureau of Reclamation,* 767 F.2d 531, 538 (9th Cir. 1985) (citing C.

1 Wright, et al., Federal Practice & Procedure § 4402 at 7 (1981)). The three elements of claim

2 preclusion are: (1) an identity of claims, (2) a final judgment on the merits, and (3) identity or

3 privity between parties. *Tahoe Sierra Preservation Council, Inc. v. Tahoe Regional Planning*

4 *Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003). The defense of res judicata can apply even if the

5 original judgment was obtained in a foreign court. *See Bank of Montreal v. Kough*, 612 F.2d

6 467, 468 (9th Cir. 1980).

7      Defendants assert that Networks has already sued on the same claim in a Bolivian court.

8 Identity of claims exists when two actions arise from the same "transactional nucleus of facts."

9 *Tahoe Sierra*, 322 F.3d at 1078. "Newly articulated claims based on the same nucleus of facts

10 may still be subject to a res judicata finding if the claims could have been brought in the earlier

11 action." *Id.* It is immaterial whether the claims that could have been pursued in the previous

12 action on the basis of the same nucleus of fact were actually pursued. *Id.* The relevant inquiry is

13 whether the claims could have been brought on the basis of the same facts. *Id.* Here, the claim

14 filed by Networks in Bolivia was based on the same purchase order and alleged breach that

15 forms the basis of Networks' breach of contract claim in this action. *See* Juan Ayoroa Decl., Ex.

16 84. Although it appears that the Bolivian action was of a criminal nature, the same transactional

17 nucleus of facts was involved. *Id.* Thus, the claims are the same for res judicata purposes.

18 Additionally, Exhibit 84 demonstrates that the plaintiff in the Bolivian action was "STM

19 Networks, Inc." and that the defendant was "Clay Pacific SRL." *Id.* Thus, the parties involved

20 in that action and the parties involved in this action were the same.

21      The salient issue, then, is whether the Bolivian action resulted in a final judgment on the

22 merits. The facts material to this issue are not in dispute, but the parties attempt to characterize

23 the facts in very different ways. Under Rule 44.1, an issue concerning the law of a foreign

24 country is a legal issue for the court to determine. Fed. R. Civ. P. 44.1. "The court, in

25 determining foreign law, may consider any relevant material or source, including testimony,

26

27

28

1     whether or not submitted by a party or admissible under the Federal Rules of Evidence." Id.[5]

2        In support of the assertion that the Bolivian court made a final determination on the

3 merits against Networks, Defendants offer Exhibit 86 and Exhibit 85. Defendants assert that

4 Exhibit 86 shows that "[o]n February 25, 2004 the Bolivian Court found in favor of Clay Pacific

5 in the lawsuit filed by Networks." Def. Statement of Genuine Issues in Opp. to Networks Inc.'s

6 Mot. for Summary Judgment, ¶ 51. However, Exhibit 86 does not appear to be a judgment.

7 Rather, Exhibit 86 states as a disposition that "the present accusation is considered not presented,

8 thus [it] should be filed, after the corresponding legal formalities." Juan Ayoroa Decl., Ex. 86.

9 Exhibit 86 does not address the merits of the claim at all and appears instead to be a dismissal

10 for failure to comply with a technical requirement. Additionally, Exhibit 85 is purported to be a

11 dismissal of Networks' lawsuit, but it states that the complainant voluntarily abandoned his

12 complaint. Juan Ayoroa Decl., Ex. 85.

13        The language of the court documents is consistent with the declarations of Emil

14 Youssefzadeh and a Bolivian attorney. Emil Youssefzadeh stated in his declaration that the

15 lawsuit was dismissed because the Bolivian court found his attorney's power of attorney

16 defective and that the Bolivian court gave his attorney three days to correct the defect before

17 dismissing the case on procedural grounds. Networks has also submitted a declaration of

18 Gonzalo J. A. Guzman Vargas, a senior partner at a law firm in Bolivia, in which he states that

19 he has "reviewed the record of the lawsuits filed at the Superior District Court of La Paz from

20 April 2003 to November 15, 2004" and that he has "found no judgments against STM Wireless,

21 Inc. . . . , Networks, or Emil Youssefzadeh." Guzman Decl., ¶ 6. These facts demonstrate that

22 no genuine dispute exists as to whether the Bolivian court issued a final judgment. Defendants

23 cannot withstand a motion for summary judgment simply by characterizing the disposition of the

24 Bolivian proceeding as a judgment on the merits. The affirmative defense of res judicata is

25

26        [5]It should be noted that Rule 44.1 requires that "[a] party who intends to raise an

27 issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice." Fed. R. Civ. P. 44.1. Despite raising res judicata as an

28 affirmative defense, Defendants failed to give such notice.

EXHIBIT 1
Page 23

1   STRICKEN.

2       **2.    Offset**

3       Under California law, "equitable offset is a means by which a debtor may satisfy in whole

4   or in part a judgment or claim held against him out of a judgment or claim which he has

5   subsequently acquired against his judgment creditor." *Salaman v. Bolt*, 74 Cal. App. 3d 907,

6   918 (Cal. Ct. App. 1977).

7       Networks seeks summary judgment on the affirmative defense of offset on the grounds

8   that the basis for the defense of offset is the same as the basis for the counterclaims, against

9   which the Court has granted summary judgment. However, Defendants' affirmative defense of

10  offset is based at least in part on alleged breaches by Networks of the Business Partnership

11  Agreement. *See* Def. Statement of Genuine Issues in Opp. to STM Networks Inc.'s Second Mot.

12  for Summary Judgment, 24-26. As discussed above, summary judgment is not proper with

13  respect to Defendants' counterclaims that are based on alleged breaches of the Business

14  Partnership Agreement, so summary judgment is also not proper with respect to Defendants'

15  defense of offset.

16      **D.    DEFENDANTS' APPLICATION FOR LEAVE TO AMEND THE**

17           **COUNTER CLAIM**

18      Defendants applied for leave to file an amended counterclaim on January 26, 2005.

19  According to the scheduling order, the last day to amend the pleadings and join parties was July

20  2, 2004, the last day to complete discovery was December 8, 2004, the last day to hear motions

21  was January 7, 2005, the pre-trial conference occurred on January 10, 2005, and a jury trial is

22  scheduled for February 8, 2005.

23      Generally, leave to amend a pleading "shall be freely given when justice so requires."

24  Fed. R. Civ. P. 15(a). Leave to amend lies within the sound discretion of the trial court, which

25  "must be guided by the underlying purpose of Rule 15—to facilitate decisions on the merits,

26  rather than on the pleadings or technicalities." *United States v. Webb*, 655 F.2d 977, 979 (9th

27  Cir. 1981). At the same time, "[t]he district court may deny a motion for leave to amend if

28  permitting an amendment would, among other things, cause an undue delay in the litigation or

1 prejudice the opposing party." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1087 (9th Cir.

2 2002). Further, once the court has issued a scheduling order, the order "shall not be modified

3 except upon a showing of good cause and by leave of the district judge." Fed. R. Civ. P. 16(b).

4 "If the party seeking the modification was not diligent, the inquiry should end and the motion to

5 modify should not be granted." *Zivkovic*, 302 F.3d at 1087 (internal quotation omitted).

6   Here, by requesting leave to amend the counterclaims, Defendants appear to have two

7 aims: (1) to allege that on May 13, 2003, after the Wireless bankruptcy, Networks and Clay

8 entered into a joint venture agreement in which they agreed to share revenues from Entel ("Joint

9 Venture Agreement") and (2) to clarify and reassert allegations of breach of the Business

10 Partnership Agreement that are contained in the First Amended Answer, which is the operative

11 pleading. Defendants assert that they should be permitted to amend the counterclaim to include

12 the alleged breach of the Joint Venture Agreement because "[i]t was only discovered in

13 November, 2004 that Networks went behind Clay Pacific's back and entered into an Extended

14 Warranty Agreement with Entel to the exclusion of Clay Pacific." However, paragraph 143(a)

15 of the First Amended Answer, filed on April 6, 2004 alleges that Networks breached the

16 Business Partnership Agreement by

17    [B]reaching the implied covenant of good faith and fair dealing in

18    paragraph 1 of the [Business Partnership Agreement] by contacting

19    Entel and having Entel execute an extended warranty agreement for

20    repairs with STM and then having all of Entel's repairs done in

21    Thailand to the exclusion of [Clay] Pacific thereby depriving [Clay]

22    Pacific of the repair revenues contemplated by the Lab System and

23    related contract.

24 FAA, ¶ 143(a). Thus, it appears that, contrary to Defendants' assertion, Defendants were aware

25 of the facts underlying the proposed amended counterclaim at least as early as April 6, 2004. At

26 the time that they filed the First Amended Answer, Defendants chose to characterize the facts as

27 constituting a breach of the Business Partnership Agreement. Now Defendants attempt to

28 characterize the same facts as a breach of a different agreement.

1     The Court declines to grant leave to amend.  Defendants have made no showing that they

2     were diligent.  Defendants were aware of the alleged facts as early as April and they sought

3     leave to amend the counterclaims only after presenting a weak and disorganized opposition to

4     Networks' motion for summary judgment.  Additionally, denying leave to amend is consistent

5     with the underlying purpose of Rule 15 because amending the counterclaim is not necessary for

6     a decision on the merits.  Paragraph 143(a) of the First Amended Answer is adequate to permit

7     Defendants to recover for the alleged breach of the Business Partnership Agreement that

8     allegedly occurred when Networks entered into the extended warranty agreement with Entel.

9     Therefore, Defendants may not amend the counterclaim.

10           **D.    PLAINTIFF'S APPLICATION TO QUASH SERVICE OF SUBPOENAS**

11                **DUCES TECUM SERVED AFTER DISCOVERY DEADLINE**

12           Counter Defendants Albert Youssefzadeh and Emil Youssefzadeh request that the Court

13    quash service of subpoenas duces tecum served on them through their counsel after the

14    discovery deadline.  Counsel for Counter Defendants asserts that counsel for Defendants served

15    the subpoenas in late December 2004.  Gerald Klein Decl., ¶ 2.  The subpoenas bear the date of

16    December 3, 2004.  *Id.*, Exs. 1, 2.  Regardless of this discrepancy, the scheduling order requires

17    that all written discovery requests be propounded at least forty-five (45) days prior to December

18    8, 2004.  Further, Defendants do not dispute that the subpoenas were served after the deadline

19    imposed by the scheduling order.  Rather, Defendants simply assert that the subpoenas are not

20    subject to the discovery deadline because they are trial subpoenas intended to ensure that Emil

21    and Albert Youssefzadeh appear at trial and produce the requested documents.

22           Defendants cannot escape the discovery deadline by simply characterizing their request

23    for discovery of documents as a trial subpoena.  Rule 26 specifically states that one of the

24    methods by which one party can obtain discovery from another party is through the use of a

25    subpoena under Rule 45(a)(1)(C).  Fed. R. Civ. P. 26(a)(5).  Thus, use of a subpoena duces

26    tecum on a party is a method of obtaining discovery and it is subject to the scheduling order and

27    the discovery deadline.  Defendants served the subpoenas at issue on counsel for Counter

28    Defendants while Counter Defendants were parties to the action and well after the deadline set

1  by the scheduling order. The subpoenas seek broad categories of documents similar to what

2  would normally be obtained during discovery. Additionally, Defendants never attempted to

3  obtain the documents sought by the subpoena through the use of more conventional discovery

4  methods before the discovery deadline.

5      The only possible explanation Defendants offer for failing to complete discovery before

6  the deadline is the same explanation offered in support of the application for leave to amend the

7  counterclaim. Again, Defendants assert that they were unaware until November 2004 that

8  Networks allegedly received revenues under an extended warranty agreement with Entel. This

9  assertion is plainly contradicted by the fact that Defendants' First Amended Answer, filed on

10  April 6, 2004, alleges a breach based on the alleged extended warranty agreement with Entel.

11  Thus, Defendants could have sought discovery of documents demonstrating the amount of

12  revenues received under the extended warranty agreement as early as April 6, 2004. Without

13  any showing of good cause, Defendants cannot wait until after the discovery deadline to compel

14  Counter Defendants to comb through their records in search of broad categories of documents to

15  be produced for the first time at trial.

16  **IV.  DISPOSITION**

17      For the reasons stated above, the Court:

18  1.  GRANTS the motion by Counter Defendants Albert Youssefzadeh and Emil

19      Youssefzadeh for summary judgment of all counterclaims against them;

20  2.  GRANTS Networks' motion for an order of summary adjudication with respect to the

21      following factual issues:

22      a.  Clay issued a Purchase Order to Networks on August 29, 2003 for 70 Solantes in

23          exchange for a price of $485,100, to be paid when the goods arrived at the

24          warehouse of Entel;

25      b.  Clay received the 70 Solantes from Networks and sold them to Entel; and

26      c.  Clay did not pay Networks the price of $485,100.00;

27      d.  Networks was bound by all executory obligations of the Business Partnership

28          Agreement arising after the date of the bankruptcy court order, March 17, 2003;

1   3.   STRIKES all affirmative defenses except for the eleventh, off set;

2   4.   GRANTS Networks' motion for summary judgment on the first portion of the first

3         counterclaim pertaining to breach of the Oral Commission Agreement;

4   5.   GRANTS Networks' motion for summary judgment on the second and third

5         counterclaims;

6   6.   DENIES Networks' motion for summary judgment on the affirmative defense of offset;

7   7.   DENIES Defendants' application for leave to amend the counterclaims; and

8   8.   GRANTS Counter Defendants' application to quash subpoenas duces tecum issued after

9         the discovery deadline.

10  This order vacates and completely supersedes the January 11, 2005 order.

11

12

13  IT IS SO ORDERED.

14  DATED: February 7, 2005

15

16

17                   DAVID O. CARTER
                   United States District Judge

18

19

20

21

22

23

24

25

26

27

28

1
2
3 ___ Priority
  ___ Send
4 ___ Clsd
  ___ Enter
5 ___ JS-5/JS-6
  ___ JS-2/JS-3
6

**FILED**

**FEB 2 2 2005**

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
DEPUTY

7

8 ## UNITED STATES DISTRICT COURT

9 ## FOR THE CENTRAL DISTRICT OF CALIFORNIA

10

11 STM NETWORKS, INC., a Delaware )     CASE NO. SACV03-1796 DOC
   corporation,                   )     (MLGx)

12           Plaintiff,        )

13                         )     **JURY VERDICT FORM**

14     v.                    )

15 CLAY PACIFIC S.R.L.; PACIFIC    )
   TELECOM S.A.; JUAN AYOROA;     )

16 ROSEMARY AYOROA; and DOES 1 )
   through 100, inclusive,          )

17           Defendants.       )

18 _____ )

19 AND RELATED COUNTERCLAIM )

20

21     We, the jury in the above entitled action, find the following special verdict on the

22 following questions submitted to us:

23

24     <u>Question No. 1:</u>     It has already been determined that Clay owes Networks

25 $450,213.89 subject only to any offsets for claims that Clay has against Networks. Do you find

26 that Clay has any offset to this amount?

27     Yes   DOCKETED ON CM No      X

28

**DOCKETED ON CM**
FEB 28 2005

DOCKETED ON CM
FEB 28 2005
BY

EXHIBIT 2
Page 29

1    If you answered Question No. 1 "no," please date, sign, and return this special verdict

2    form.  If you answered "yes," please proceed to Question No. 2.

3

4    Question No. 2:    Did Networks breach the Business Partnership Agreement by failing

5    to perform any obligations that arose under the Business Partnership Agreement after March 17,

6    2003?

7    Yes _____    No _____

8    If you answered Question No. 2 "no," please skip ahead to Question No. 4.  If you

9    answered "yes," please proceed to Question No. 3.

10

11   Question No. 3:    What is the total amount of damages arising out of the breach of the

12   Business Partnership Agreement by Networks after March 17, 2003?

13   Answer:    $_____

14   Please proceed to Question No. 4.

15

16   Question No. 4:    Did Clay and Networks enter into an oral contract to share revenues

17   in May 2003?

18   Yes _____    No _____

19   If you answered Question No. 4 "no," please skip ahead to Question No. 9.  If you

20   answered "yes," please proceed to Question No. 5.

21

22   Question No. 5:    Did Clay do all, or substantially all, of the significant things that the

23   May 2003 contract required it to do?

24   Yes _____    No _____

25   If you answered Question No. 5 "no," please skip ahead to Question No. 9.  If you

26   answered "yes," please proceed to Question No. 6.

27   ///

28   ///

EXHIBIT 2
Page 30

1      <u>Question No. 6</u>:    Did Networks breach the May 2003 contract by failing to do

2  something the May 2003 contract required it to do?

3          Yes  _____    No    _____

4      If you answered Question No. 6 "no," please skip ahead to Question No. 9.  If you

5  answered "yes," please proceed to Question No. 7.

6

7      <u>Question No. 7</u>:    What is the total amount of damages to Clay arising out of the breach

8  of the May 2003 contract?

9          Answer:    $ _____

10     Please proceed to Question No. 8.

11

12     <u>Question No. 8</u>:    What is the amount of offset you find Networks has, if any, to the

13 amount you found in Question No. 7?

14         Answer:    $ _____

15     Please proceed to Question No. 9.

16

17     <u>Question No. 9</u>:    Did Clay and Networks enter into an oral contract in April 2003 to

18 give Clay a credit for 100 Space Webs?

19         Yes  _____    No    _____

20     If you answered Question No. 9 "no," please date, sign, and return this special verdict

21 form.  If you answered "yes," please proceed to Question No. 10.

22

23     <u>Question No. 10</u>:    Did Clay do all, or substantially all, of the significant things that the

24 April 2003 contract required it to do?

25         Yes  _____    No    _____

26     If you answered Question No. 10 "no," please date, sign, and return this special verdict

27 form.  If you answered "yes," please proceed to Question No. 11.

28

1      <u>Question No. 11</u>:   Did Networks breach the April 2003 contract by failing to do

2   something the April 2003 contract required it to do?

3        Yes _____       No _____

4      If you answered Question No. 11 "no," please date, sign, and return this special verdict

5   form. If you answered "yes," please proceed to Question No. 12.

6

7      <u>Question No. 12</u>:   What is the total amount of damages to Clay arising out of the breach

8   of the April 2003 contract?

9        Answer:    $_____

10  Please proceed to Question No. 13.

11

12      <u>Question No. 13</u>:   What is the amount of offset you find Networks has, if any, to the

13  amount you found in Question 12?

14        Answer:    $_____

15

16

17  Please date, sign, and return this special verdict form.

18

19  Dated: _2/22/05_       Foreperson _____

20                    WAYNE M. FLORIAN

21

22

23

24

25

26

27

28